OPINION
Defendant-Appellant Mark Lindsey Owens is appealing his conviction of one count of rape of his daughter and six counts of gross sexual imposition against his three children. At sentencing, Owens was found to be a sexual predator, and was sentenced to life imprisonment plus an additional eighteen years, to be served consecutively. He now appeals, asserting eighteen assignments of error. Additionally, Owens has filed a motion for de novo review of the sealed Montgomery County Children's Services Bureau (MCCSB) case file regarding his family.
Owens was indicted by the Montgomery County Grand Jury on December 16, 1997, on one count of rape of his daughter, Lauren Owens, and two counts of gross sexual imposition against each of his three children, Lauren, Mark, Jr. and Michael Owens. All seven counts were alleged to have occurred between July 1, 1996, and September 20, 1997; all three children were under the age of thirteen during this time period.
On February 3, 1998, Owens requested a bill of particulars from the State, requesting more specific dates and times at which the alleged events occurred. On that same day he also filed a motion to sever. The State of Ohio filed its bill of particulars on March 10, 1998, however no specific dates were provided.
Owens sent a subpoena to MCCSB on March 2, 1998, for the complete case file of the family to assist in the preparation of his defense. On March 6, 1998, MCCSB, by and through counsel, the Montgomery County Prosecutor's Office, filed a motion to quash the subpoena and for a protective order or an in camera inspection of the case file.
The parties entered into a pretrial agreement and stipulation on April 2, 1998. This agreement stated that Owens would sit for a polygraph examination, would fully cooperate with the examiner, and would speak freely with the examiner concerning the alleged crimes. The agreement further stated that all information obtained from the polygraph examination would be admissible at trial without objection.
During the course of pretrial negotiations, Owens requested several continuances. The trial was set for May 26, 1998. Prior to trial, Owens again subpoenaed the MCCSB's case file, and on May 5, 1998, MCCSB filed another motion to quash the subpoena and for a protective order or an in camera inspection.
The State filed a response to Owens' motion to sever on May 20, 1998. The State argued that the joinder of all offenses was proper because all offenses were acts against Owens' children and were part of a course of criminal conduct. The State contended that the jury would easily be able to separate the offenses because the witnesses for all counts were generally the same, the charges were not complex, and there were a limited number of victims.
A jury trial commenced on May 26, 1998. Prior to the start of trial the trial court considered several motions in limine that Owens had filed. The first motion dealt with the introduction of evidence of physical violence toward the children. Owens argued that the probative value of such evidence would be greatly outweighed by its prejudice. The trial court "cautioned" both sides, noting that physical violence of the children would only be relevant if used to show "force" of the children to submit to Owens' sexual conduct. Owens' second motion requested that the trial court prohibit the introduction of his prior criminal record, to which the State agreed and noted that its witnesses had been warned against mentioning Owens' record.
Owens then renewed his motion for severance, claiming that he could not receive a fair trial on Lauren's case if it were tried with the boys' cases. The State countered that all three victims were Owens' children whom he had abused over a long period of time. The trial court denied the motion for severance.
The trial court addressed MCCSB's motion to quash and Owens' request of the trial court for an in camera review of the MCCSB case file. The trial court sustained MCCSB's motion to quash, stating that it had reviewed the entire case file and had found "nothing discoverable" in the case file.
At that time, Owens' trial counsel noted on the record that Owens had agreed to take the polygraph test, against trial counsel's advice, because "God told him" to take it. Trial counsel then objected to the polygrapher's report because it was prejudicial. The trial court noted counsel's objections.
The testimony at trial is summarized as follows:
 Owens was accused of sexual abuse of his three children between July 1, 1996, and September 20, 1997. During this time, Owens lived at 1022 Dunaway in Miamisburg, Ohio, with his daughter Lauren (born February 2, 1995), his son Michael (born July 11, 1991), and Kimberly Owens, n.k.a. Kimberly Smith, who was his wife at the time and mother of Lauren. Kim's son from a previous marriage, Brandon Morgan, also resided with them. Mark, Jr. (born May 21, 1990) and Michael, are the product of Owens' previous marriage to Tina Owens, n.k.a. Tina Heaton. During the time in question, Mark, Jr. lived with Tina, however, he would visit periodically with Owens at Owens' home.
Tina and Owens were married in July of 1990. In October of 1990, when Mark, Jr. was approximately four months old, Tina walked into a room and saw Mark, Jr. on the bed with his feet dangling off the mattress. Owens was hovering at the end of the bed over Mark, Jr.'s feet, and Owens had his hand down his pants. Upon Tina walking in the room, Owens jumped up and removed his hands from inside his pants. Tina confronted Owens about this behavior, but he denied that he had been engaging in any sexual behavior. Despite this denial, Owens jerked the phone from Tina's hands and would not permit Tina to leave the house. He convinced her that she was "imagining" things.
Two weeks later, Tina arrived home from the laundromat and looked in the window before entering her house. She saw Mark, Jr. in his baby seat with his feet sticking out from the blankets, and Owens masturbating as he sat in front of Mark, Jr. Tina ran inside, grabbed Mark, Jr. and tried to leave; Owens again restrained her and told her she had been imagining the events.
Tina and Owens eventually divorced, and she obtained custody of both boys. During the course of the divorce and thereafter, Tina had called in several referrals to MCCSB for alleged physical and sexual abuse by Owens of the boys, none of which had been substantiated.
Kim and Owens were married in November of 1994. In July of 1996, despite Tina's concerns that Owens had sexually abused Mark, Jr., Tina permitted Michael to live with Owens with the understanding that Kim was to act as a "supervisor." At first, Kim disregarded Tina's allegations that Owens had sexually abused Mark, Jr., knowing that Tina had mental health issues. However, throughout the course of her marriage to Owens she witnessed him behave in ways that led her to question whether the allegations were true. Kim witnessed Owens spread the boys' buttocks cheeks apart, seemingly to check for cleanliness. Owens would do this at times when the children would not have just gone to the bathroom.
Owens would often make the boys rub lotion on his feet at night while he was in bed, and he would punish them if they refused. Kim stated that during these "massages," Owens would either be naked or only be wearing his undergarments.
There was testimony concerning Owens' physical discipline of the children. He would "bare-bottom spank" the children, and sometimes this occurred in public places. Two days before Kim moved out of the residence, Owens had bare-bottom spanked Lauren in the Value City parking lot.
Kim described one incident during this time period where Michael experienced a sleepwalking episode where he walked into Kim and Owens' bedroom, walked to Owens' side of the bed, pulled his pants down and stood there while he shook and whined. At approximately that same time, Michael also started wetting the bed and having nightmares.
Around the time Kim moved out of the home, in September of 1997, she began noticing that Lauren was acting out sexual behavior. Kim stated that she had seen Lauren "sitting with her fingers up inside of her," and that Lauren had walked around the house while masturbating. Initially, Kim did not question Lauren about this behavior, but simply explained to her that it was inappropriate. However, upon commenting on this behavior in October of 1997, Lauren stated to Kim and Kim's mother "Well, my daddy did that. * * * He touched my pee-pee and he touched my butt and he smelled it and then he ate it."
Several weeks later, after Lauren had repeated this behavior and her comments, Kim contacted Det. Marsh at the Miamisburg Police Department and reported the suspected sexual abuse. All three children were interviewed by the police and MCCSB and underwent physical examinations at Children's Medical Center.
Lauren was examined at Children's Medical Center by child psychologist Dr. Gregory Ramey. Dr. Ramey testified that, during his examination, Lauren's actions had initially seemed very age appropriate. Dr. Ramey spoke with Lauren, had her draw some pictures and had shown her a series of pictures and asked her to describe what she saw. However, during this process, Lauren had made some comment about her father and had used a word that Dr. Ramey could not understand. He had asked Lauren some follow up questions, to which Lauren began drawing squiggly lines on her paper, and she described the drawing with another word that Dr. Ramey could not understand. Dr. Ramey had remained silent but continued to observe Lauren's behavior. Lauren made a spontaneous verbalization, stating that Owens "touch my bottom and my pee-pee." Dr. Ramey, unsure of what Lauren was trying to communicate to him, brought a doll to her and asked Lauren to demonstrate with the doll. Lauren placed her finger in the vaginal and anal areas of the doll, pulled her finger out, then placed her finger in her mouth. Lauren proceeded to take Dr. Ramey's hand and do the same to the doll. Lauren indicated that is what her father had done to her.
Dr. Ramey testified that this behavior was extremely age-inappropriate. This series of actions ending with Lauren placing her fingers in her mouth raised a "high degree of suspicion" that Lauren had been sexually molested, as most children would associate that activity as being "dirty" or "disgusting." Dr. Ramey also stated that such behavior is "extremely, extremely rare," and it was "almost impossible" that a child of Lauren's age could be influenced by someone to the degree that she would act out and demonstrate such behavior.
Both Mark, Jr. and Michael testified at trial. Mark, Jr. stated that his father had "smelled" his buttocks and his feet more than once in the past, and that Owens would fondle his penis while giving him a bath. Mark, Jr. also testified to enduring much physical discipline by Owens. Michael similarly testified to physical beatings, and he spoke of an incident when Owens had hit him so hard on the head that he had stayed home from school for four days because of the bruising. Michael also stated that his father made him watch a "naked show," and that Owens would rub his penis back and forth. Both children made similar statements to the caseworker from MCCSB, and Michael stated such to Det. Marsh.
No physical evidence of abuse was detected on any of the three children, however given the details of the boys' statements and all three children's behavior, Owens was indicted on the offenses.
Ed Vecchio, a certified polygraph examiner and an investigator with the welfare theft division of the Montgomery County Prosecutor's Office, testified extensively as to the procedure and results of Owens' polygraph examination. Vecchio explained that he had followed a predetermined testing format in conducting Owens' polygraph examination. Vecchio had met with Owens for approximately three hours, during which Owens willingly signed a form indicating that he understood his constitutional rights. He and Vecchio had discussed the allegations and all evidence in the case "line by line." Vecchio stated that this long process was extremely important because all issues in the case had to be understood fully by Owens and Vecchio in order to collaborate and formulate questions for the examination. These questions would be based upon the discrepancies between the allegations and Owens' version of the facts. Also, the length of time was necessary to help relax Owens, which was important in obtaining accurate physiological measurements during the test.
During their conversation, Owens denied all of the allegations against him, stating to Vecchio that he believed his ex-wives were working in collusion with the children to prove these accusations. He also stated that he had a good relationship with his children.
Owens did make several admissions to Vecchio during the course of their meeting. Owens admitted that he became sexually aroused from smelling the rectums and feet of other people. Owens spoke of an incident that occurred when Michael was four and a half years old, where he had smelled Michael's rectum with the intention of masturbating himself, but he had changed his mind. Owens admitted that he had smelled Brandon's feet four times and masturbated. Owens also admitted that he had masturbated in the presence of his children, although he was "certain" that they were not aware of what he was doing because he had been covered by a blanket or had remained fully clothed.
The polygraph examination was administered twice, and Vecchio read and analyzed the charts. The results of the examination indicated deception by Owens on those questions relating to his sexual abuse of the children. Vecchio shared this result with Owens, who claimed that he had answered all of the questions truthfully. Vecchio then gave Owens the opportunity to write out a statement to explain what his position was on the allegations. In his voluntary written statement, Owens acknowledged as true some of the statements he had made during the interview portion of the examination; he remained steadfast that he had not sexually abused the children.
On May 29, 1998, Owens was convicted of all seven counts. On August 13, 1998, the trial court determined that Owens was a "sexual predator." It sentenced him to life imprisonment on the rape conviction and to three years on each of the remaining six counts of gross sexual imposition, to be served consecutively to each other for a total sentence of life imprisonment plus eighteen years.
Owens filed his notice of appeal on August 24, 1998. Owens subsequently filed a motion for this court to conduct a de novo
review of the materials contained in the MCCSB case file for determination of the presence of evidence that should have been made known to Owens. Owens claims that the trial court's denial of access to his statements contained in the MCCSB case file deprived him of his "basic constitutional rights."
The State filed a motion in response on November 8, 1999, stating that a trial court has broad discretion in regulating discovery during litigation, and the trial judge's determination in this case should be afforded deference. Furthermore, the State argued that disclosure of evidence is necessary only where evidence exists that is both favorable to the defendant and is material to guilt or punishment, citing State v. Lawson (1992),64 Ohio St.3d 336, 343.
Upon extensive review of the entire MCCSB case file, pursuant to Owens' motion, we find that the trial court did not abuse its discretion in granting MCCSB's motion to quash. There exists no information in the sealed case file that should have been made known to Owens prior to trial. Consequently, we find that Owens' constitutional rights were not violated.
We will now address Owens' eighteen assignments of error.
 I. Conflict of interest existed when the Prosecuting attorney appeared as both prosecutor and as attorney for the Childrens' {sic} Services Bureau.
Owens argues that a conflict of interest existed in the Montgomery County Prosecutor's Office's representation of both the State of Ohio in the criminal case against Owens and of MCCSB in the children's case. However, in this assignment of error, Owens primarily focuses on the trial court's granting of MCCSB's motion to quash. Having found that the trial court did not abuse its discretion in granting MCCSB's motion, we will address the issue of whether a conflict of interest did exist.
Owens contends that the State had access to the case file because of its representation of MCCSB. Owens subtly implies that he was unfairly prejudiced by the prosecutor's office's dual representation of the State of Ohio and MCCSB. Articulated during oral arguments were Owens' speculations that had the State not represented MCCSB, MCCSB would have been more amenable to discovery of their case file on the family.
We do not share Owens' view of this dual representation. To begin, Owens lacks standing to assert a conflict of interest argument because he is not a party to the attorney-client relationship, and he has failed to demonstrate how he was prejudiced by such. Morgan v. North Coast Cable Co. (1992),63 Ohio St.3d 156, syllabus; Phelps v. Fowler (1995), 107 Ohio App.3d 263,271.
In any event, we find that no conflict of interest did exist. Anne Dettmer, supervising attorney for the Child Protection Unit of the Montgomery County Prosecutor's Office, filed the motion to quash on behalf of MCCSB. Janet Sorrell was the assistant prosecuting attorney representing the State of Ohio in the criminal case against Owens. There is no evidence in the record that the two assistant prosecuting attorneys collaborated in presenting the criminal case against Owens. To the contrary, after Owens renewed his motion for an in camera review of the MCCSB case file, Sorrell noted on the record that she had not had a chance to view the case file, and requested that the trial court reveal any pertinent information in the case file that the State would have a right to discover. Moreover, Owens' speculations remain speculations, as he provided no evidence that MCCSB would have acted differently had it not been represented by the State.
Accordingly, Owens' first assignment of error is overruled.
II.
 The trial court erred in allowing evidence into the record of physical abuse.
Owens assigns as error several lines of trial testimony which he claims violated his constitutional rights and denied him a fair trial. Owens first finds error in Kim's statements that she acted as "supervisor" of Owens' relationship with the boys. He argues that this placed his "bad conduct" before the jury. Owens claims that the court documents indicated a change in custody but made no mention of supervised visitation. Owens urges this court to "take judicial notice of the custody order." However, resolution of Owens' allegations would require us to consider evidence outside the record which was not produced at trial. In a direct appeal, this court's review is limited to evidence presented at trial; we cannot consider matters outside the record before us. State v.Ishmail (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, paragraph one of the syllabus.
At trial, Owens provided no evidence to prove that the supervised visitation was a fiction. "A fundamental rule of appellate review is that a reviewing court will not consider as error any issue that a party was aware of but failed to bring to the trial court's attention." State v. Powers (1995), 106 Ohio App.3d 696,699, citing Schade v. Carnegie Body Co. (1982),70 Ohio St.2d 207, 210, 24 O.O.3d 316, 317. Thus, Owens has waived the right to contest this issue on appeal since he failed to raise it at the appropriate time in the court below. Additionally, trial counsel did not object to the terminology or the mention of supervised visitation, but we find that any resulting error would not rise to the level of plain error.
He also claims error in the prosecutor's questioning of Kim as to whether she had been aware that Owens "had been abusing the boys." Upon review of the record, we do not agree with Owens that this placed his "bad conduct" before the jury. We find that it was a direct reference to the sexual abuse allegations Tina had conveyed to Kim, which were extremely relevant and probative in the case.
Finally, Owens argues that he was denied a fair trial because the prosecutor questioned Kim, over objections, about the physical discipline of the children. Owens contends that the probative value of this testimony was greatly outweighed by the prejudice to the jury.
We disagree. Evidence of the family dynamics and Owens' physical disciplining of his children was central to the issue of force in the rape of Lauren. As stated in paragraph one of the syllabus in State v. Eskridge (1988), 38 Ohio St.3d 56:
 The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required were the parties more nearly equal in age, size and strength.
Id., citing State v. Labus (1921), 102 Ohio St. 26, 38-39. InEskridge, supra, the victim was a four-year old girl who was raped by her father. The Eskridge court found that R.C.2907.02(B) requires only a "minimal force or threat of force" be used in the commission of a rape of a child. Id. at 58. The court recognized the inherent coercion present in parental authority in a situation where a father sexually abuses his child, and determined that "[f]orce need not be overt and physically brutal, but can be subtle and psychological." Id.
The court further stated:
 * * * Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose.
 Id. at 59. (Citation omitted.)
The evidence of routine and humiliating discipline of the children was relevant, probative evidence introduced for the purpose of proving psychological force of Lauren to the act of rape. It demonstrated that Owens stood in a position of authority over his children, and that if they would disobey him, they would be physically punished.
Accordingly, Owens' second assignment of error is overruled.
III.
 The trial court erred in admitting into evidence testimony regarding the past criminal convictions of defendant.
Owens claims error in the introduction of cross-examination testimony from Kim that briefly referred to Owens' police record. Owens contends that this line of testimony was so damaging and prejudicial that it constitutes ineffective assistance of counsel. We do not agree.
The testimony at issue resulted from defense counsel's asking Kim her reasons for moving from Owens' home and separating from him in September of 1997. Kim described the incident in the Value City Parking Lot where Owens bare-bottom spanked Lauren. This testimony followed:
 Q. Well, was that the straw that broke the camel's back? Is that the incident that fired you up to move out of the Dunaway Street property in Miamisburg?
A. One of them, yes.
 Q. It was one of them. Was there anything after that date until you moved out two days later that caused you to move out?
 A. Yes. The next day, Friday, his ex-wife, Tina, brought me some past police records that I knew nothing about. And once I read over them, it really upset me.
(Tr. 149-150) This was the extent of the testimony regarding Owens' past police record.
Preliminarily, we note that Kim's testimony was elicited on cross-examination by defense counsel, thus Owens invited any error which may have been committed. Under the doctrine of invited error, a party who induced an error at trial is prohibited from asserting that error on appeal. State v. Bey (1999), 85 Ohio St.3d 487,493; State v. Hill (1987), 37 Ohio App.3d 72, 75-76;State v. Kniep (1993), 87 Ohio App.3d 681, 686.
However, it appears as if the defense strategy was to attack Kim's credibility by eliciting testimony regarding why she delayed separating from Owens and moving out from the Dunaway Street home. Trial counsel based Owens' defense on two vindictive ex-wives conspiring against Owens. It was reasonable for counsel at trial to pursue a line of questioning which could possibly lead to evidence to bolster this argument and attack Kim's credibility. A debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. State v.Clayton (1980), 62 Ohio St.2d 45, 16 O.O.3d 35. Given the dynamics of this case, this court concludes that trial counsel's decision to pursue this testimony did not fall below the minimal requirements for effective assistance.
Finally, Owens also claims as error the prosecutor's questioning of Kim if she was aware of the allegations that Owens had been abusing the boys. As we noted in Owens' second assignment of error, this line of questioning did not constitute error, and we do not find this to be a violation of Owens'Fifth Amendment rights.
Owens' third assignment of error is overruled.
IV.
 Appellant was denied due process of law and/or that the State of Ohio committed intentional prosecutorial misconduct by the withholding of more specific dates and times of the alleged offences and/or by failing to disclose said specific dates and times in the bill of particulars.
The seven separate offenses charged in the indictment involved the repeated sexual abuse of three children who had been between the ages of two and seven. The dates specified for all charges were between July 1, 1996, to September 20, 1997. At Owens' request, the State filed a bill of particulars, however, the dates of the offenses remained unchanged. Owens now argues that the State did possess more specific information concerning the dates of the offenses, as evidenced by their later presentation at trial. As such, Owens argues that he was materially prejudiced by his inability to properly establish an alibi and his inability to question the veracity of the State's witnesses.
Owens was charged with rape of his two-year old daughter by force or threat of force, in violation of R.C. 2907.02(A)(1)(b), and six counts of gross sexual imposition against all three of his children who were under the age of thirteen, in violation of R.C.2907.05(A)(4). The precise dates and times of such sexual criminal conduct are not essential elements of those offenses. State v.Barnecut (1988), 44 Ohio App.3d 149; State v. Boehm (Dec. 31, 1997), Montgomery App. No. 16335, unreported. However, if requested, "the State must supply specific dates and times for the alleged offenses if it possesses that information." Boehm, supra, citing State v. Sellards (1985), 17 Ohio St.3d 169. Owens argument is that the State possessed more specific information pertaining to the rape of Lauren, as evidenced by Kim's testimony temporally placing the rape during the middle of October 1997.
We do not agree with Owens' interpretation of the trial testimony. Kim stated that she witnessed Lauren acting out sexual behavior prior to her leaving the home in September of 1997. Moreover, Kim testified that it was not until October of 1997 that Lauren made the statement that Owens "touched my pee-pee and he touched my butt and he smelled it and then he ate it." Thus, Kim testified not that the rape had occurred in October, but that she saw Lauren exhibit sexual behavior and verbally connected Owens to the conduct at that time.
Furthermore, as the State pointed out in its brief, the time period in the indictment spanned fourteen and a half months beginning with the time Michael came to live with Owens (July 1, 1996) and ending with Kim's separation from Owens (September 20, 1997). No witness testified to specific dates as to when the events had occurred. All of the witnesses, including the boys, testified that the events occurred sometime within this fourteen month span of time.
However, even when it is determined that the State does not possess more specific dates for the offenses, the lack of specific dates may be fatal to the State "if it creates material detriment to the defendant's ability to defend himself: for example, where the defendant asserts an alibi or claims he was elsewhere during part, but not all, of the time period specified for the offenses."Boehm, supra. (Citation omitted.) Owens claims he was materially prejudiced by being denied the opportunity to present defenses against all of the charges. However, Owens failed to assert an alibi defense, and he failed to present any evidence that he was not present or not alone with the children during part of the time when the offenses allegedly occurred. In fact, Owens presented no testimony to rebut the State's evidence that during the alleged time frame Owens had been left alone periodically with the children while Kim was at work or running errands.
Owens' posture in this case is similar to the defendant's inBoehm, supra. In that case, the court stated the following:
 "A defendant is not prejudiced by the failure of the indictment to specify the dates and times upon which the charged offenses allegedly occurred if such failure does not impose a material detriment to the preparation of his defense. Where the defendant does not present an alibi defense, where he concedes being alone with the victims of the alleged sex offenses at various times throughout the relevant time frame, and where his defense is that the alleged touchings never happened, the inexactitude of dates or times in the indictment is not prejudicial error."
Id., quoting Barnecut, supra, at paragraph one of the syllabus. As in Boehm, supra, Owens has not demonstrated that his ability to defend himself was prejudiced by the lack of more specific dates and times when these offenses were committed. Therefore, the lack of more specific dates did not deprive Owens of a fair trial or due process of law.
Accordingly, Owens' Fourth Assignment of Error is overruled.
V.
 The trial court erred in failing to grant a motion for severance.
Owens claims error in the trial court's denial of his Crim.R. 14 motion to sever the charges involving Lauren from those involving the boys. Owens urges that he was prejudiced by the failure to sever because of the highly inflammatory nature of the offenses and because the jury cumulated the evidence in determining his guilt. He also argues that by joining the offenses, the State was allowed to bring in "other acts" testimony which the jury would not have been permitted to consider had the trials been separate.
Under Crim.R. 8(A), joinder is permitted if offenses are of the same or similar character, are based upon the same act or transaction, or are based upon two or more acts or transactions connected together or part of a common scheme or course of criminal conduct. See, also, State v. Franklin (1991), 62 Ohio St.3d 118
. It has long been held that "joinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries." State v. Torres
(1981), 66 Ohio St.2d 340, 343, citing State v. Thomas (1980),61 Ohio St.2d 223, 225.
However, a defendant may file a Crim.R. 14 motion to sever if he can establish prejudice to his rights. A reviewing court may reverse a trial court's decision denying a motion to sever if an appellant affirmatively shows that (1) his rights were prejudiced, (2) at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) the trial court abused its discretion by refusing to separate the charges for trial. Torres, supra, at syllabus. Furthermore, in reviewing whether a defendant's rights would be prejudiced by the joinder of multiple offenses, a court must determine if evidence of the first offense would have been admissible at the trial of the second offense under Evid.R. 404(B), and, if not, whether "the evidence of each of the crimes joined at trial is simple and direct." Franklin, supra, at 122. See, also, State v. Hamblin (1988), 37 Ohio St.3d 153, 158-159;State v. McCleskey (Nov. 16, 1994), Montgomery App. No. 14351, unreported. It is believed that the jury is capable of segregating the proof on multiple offenses when the evidence as to each offense is uncomplicated and is sufficient to sustain a verdict on each charge. Franklin, supra, at 122.
We find that simple, direct and uncomplicated evidence exists in the record for each crime, thus the trial court did not abuse its discretion in denying Owens' motion to sever. Kim testified that Owens would spread the boys' buttocks and squeeze their groin area, thus providing the evidence to convict Owens on one count of gross sexual imposition involving each boy. The boys testified to Owens fondling their penises, thus providing evidence of a second count of gross sexual imposition for each boy. In contrast, Dr. Ramey and Kim offered testimony concerning the remaining charges involving the sexual abuse of Lauren, in particular, her behavior and the statements she made to them. It is clear that no victim provided evidence to prove the offenses against the other victims, and the other witnesses were very victim-specific in their testimony.
Thus, we find that Owens has failed to show the necessary prejudice required under the first prong of the test in Torres,supra. We further find no abuse of discretion by the trial court in denying appellant's Crim.R. 14 motion for severance. Owens' fifth assignment of error is overruled.
 VI. Ineffective assistance of a counsel occurred when the defendant was left in the interview room for a period of three hours resulting in not only the acquiescence of his rights via a lie detector test, but also having him surrender a signed confession.
Owens' argument for ineffective assistance of trial counsel is based upon his participation in a three hour polygraph examination procedure, without the accompaniment of counsel. Owens claims that as a result of trial counsel's ineffectiveness, the polygraph examiner, Ed Vecchio, who worked for the prosecutor's office and was a commissioned deputy sheriff, obtained oral admissions and a written statement from Owens without alerting Owens to his Miranda rights. Absent from Owens' argument is the ineffective assistance of counsel standard and any evidence supporting his argument that counsel was ineffective.
 To show ineffective assistance of counsel, a defendant must prove that his trial attorney's representation fell below an objective standard of reasonableness and that the defendant was prejudiced by the deficient performance. Strickland v. Washington (1984), 466 U.S. 668, 687-688; State v. Bradley
(1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus. In order to show prejudice, the defendant must prove that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. Strickland, supra, at 694.
In viewing whether Owens' trial counsel was ineffective in this case, we must examine the evidence surrounding the agreement to submit to the polygraph examination. Prior to the start of trial, Owens' trial counsel noted that he did not advise Owens to submit to the polygraph examination:
 Mr. Cox: The next issue, Judge, is there — in this particular case, while this matter has been pending, my client took a stipulated polygraph test through the Montgomery County Prosecutor's Office. He had made an inquiry to me and I gave him my opinion, under the facts and circumstances, he should not take the test.
 However, his indication was in his belief in the Supreme Being, God, that he was told that he should take it. He wanted to take it. And based on that, an agreement was entered in with the prosecuting attorney certain stipulated — there's a report — has that report been filed, Miss Sorrell?
Ms. Sorrell: The stipulation has been filed.
 Mr. Cox: Okay. So it's in the Court folder, the stipulation. As a result of that, there was a polygraph test conducted. I did receive a report from that. I'm going to object to the polygraph report because it covers matters — it's so broad and inclusive, and it covers matters so prejudicial to the accused.
(Tr. 5-6) Trial counsel made it clear in the record that the polygraph examination was performed against his advice, however he and Owens entered into the pretrial agreement and stipulation upon Owens' decision. Despite the agreement, counsel wanted to make his objections known to the court on the record, thus he objected to the introduction of the polygraph examiner's report. We are unconvinced that trial counsel was ineffective. We see no prejudice in the way trial counsel represented Owens during the polygraph examination, and we fail to see how the representation fell below an objective standard of reasonableness.
Moreover, in reviewing the record, we find that the testing procedures complied with the agreement. Ed Vecchio testified extensively regarding the polygraph procedure. He stated that he had followed a "predetermined format" for the test, that Owens did voluntarily sign a rights form, and that the amount of time Vecchio spent with Owens was to ensure the accuracy of the testing procedure. Vecchio explained how it was essential to thoroughly review the case with Owens to ensure that both Owens and Vecchio had a full and accurate understanding of the issues. Because the record provides support that the testing procedures were proper, we cannot see how Owens' trial counsel's performance fell below an objective level of reasonableness, given that Owens willingly entered into the agreement.
Owens' sixth assignment of error is overruled.
VII.
 Prosecutorial misconduct occurred when the defendant was deprived of his right to a fair trial by the repeated and accumulative leading and improper questioning by the prosecutor.
Owens claims prosecutorial misconduct resulting from various leading and improper questions. In considering claims of prosecutorial misconduct, an appellate court must examine whether the prosecutor's conduct at trial was improper, and if so, whether this conduct affected the defendant's substantial rights. Statev. Lott (1990), 51 Ohio St.3d 160, 165. The analysis centers on the fairness of the trial, not the culpability of the prosecutor, in determining whether the prosecutor's conduct is grounds for error. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24; State v.Maurer (1984), 15 Ohio St.3d 239. Error exists if it is clear beyond a reasonable doubt that the jury would not have found the accused guilty absent the prosecutor's comments. State v. Smith
(1984), 14 Ohio St.3d 13, 15; State v. Benge (1996), 75 Ohio St.3d 136,141. In reviewing the statements, the prosecutor's statements must be examined in the context of the record as a whole; harmless errors must be disregarded. United States v.Hastings (1983), 461 U.S. 499, 509. Additionally, the state is permitted wide latitude in commenting on and drawing inferences from the evidence. State v. Stephens (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 185.
Furthermore, Evid.R. 611(C) provides that leading questions should not be used on direct examination except as necessary to develop the testimony of a witness. The phrase "except as may be necessary to develop his testimony" is quite broad, and grants the trial court discretion in determining the limits upon the use of leading questions under direct examination. State v. Lewis
(1982), 4 Ohio App.3d 275, 278. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173.
Upon review of the record, we do not find that the prosecutor's conduct meets the test set forth in Lott and Smith,supra. Despite Owens' assertions to the contrary, a review of the record shows that trial counsel failed to object to most of the questions which Owens now claims as error. Failure to object "constitutes a waiver of any claim of error relative thereto, unless but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, syllabus; State v. Ballew (1996), 76 Ohio St.3d 244, 254.
If it were error for the trial court to allow the prosecution to lead the witness on direct examination, it was not plain error and did not rise to a manifest miscarriage of justice. Thus, we find the examples cited by Owens are insufficient to demonstrate misconduct on the part of the prosecutor. Accordingly, we overrule Owen's seventh assignment of error.
VIII.
 The court erred in allowing numerous hearsay comments into the record despite the prohibition in Evidence Rule 807.
In this eighth assignment of error, Owens argues that Dr. Ramey's testimony to Lauren's verbalizations was hearsay and inadmissible because it did not comply with the "independent proof" criteria of Evid.R. 807(A)(3). The State argues that the statements should be admissible under Evid.R. 803 for purposes of diagnosis and treatment, however we believe that the statements were admitted for the purpose of establishing the abuse. As such, we will evaluate Owens' assignment of error on the basis of whether it meets the criteria under Evid.R. 807(A)(3).
We begin by noting that this line of testimony was not met with objection by Owens' trial counsel, thus we must evaluate this assigned error in terms of whether it amounts to plain error. Under Evid.R. 807(A)(3), out-of-court statements of a child are not excluded as hearsay if there exists independent proof of the sexual act. In evaluating whether "independent proof" of the sexual act did exist, we are aware that no physical evidence of the sexual abuse existed, however we find that Lauren's behavior of masturbating compounded with her statements to Kim that Owens "touched my pee-pee and he touched my butt and he smelled it and then he ate it" would qualify as independent proof. As such, we cannot say that the admission of Lauren's statements through Dr. Ramey's testimony amounted to plain error.
Owens' eighth assignment of error is overruled.
We will address Owens' ninth and tenth assignments of error together, as they are interrelated.
IX.
 The trial court erred in not following the strict stipulations regarding the admissibility of polygraph results per State v. Souel.
 X.
 The court erred in failing to properly charge the jury in accordance with the Souel mandates.
Owens contends that he was denied a fair trial because the State failed to comply with the mandates in State v. Souel (1978),53 Ohio St.2d 123, under which the polygraph test results would have been inadmissible. Owens further argues that the trial court was deficient in its instructions to the jury regarding such testimony. However, in his brief, Owens fails to list the Souel
conditions, he fails to specify which conditions he feels were not met, and he fails to direct us to those portions of the charge which were in error. Having reviewed the record and the applicable law, we overrule these two assignments of error.
The Ohio Supreme Court set the following conditions as requisites for admissibility of polygraph evidence at trial:
 The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:
 (1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.
 (2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.
 (3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:
(a) the examiner's qualifications and training;
(b) the conditions under which the test was administered;
 (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,
 (d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.
 (4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.
 Id. at the syllabus.
In this case, a written stipulation was willingly entered into by the parties, providing for Owens' submission to the polygraph test and the subsequent admission of the graphs, Vecchio's report, and opinion testimony. The State provided the trial court with extensive testimony regarding Vecchio's qualifications as a polygraph examiner, and that the conditions were proper under which the test was administered to Owens. Owens was given the opportunity to exercise his right to fully cross-examine Vecchio regarding his qualifications and training, the administration of the test, the testing procedure, the reliability and limitations of polygraphs in general, and Vecchio's report and conclusions. Hence, his ninth assignment of error is meritless because the stipulations under Souel, supra, were met.
We further find that in this instance, the trial court did comply with the requirements under Souel, supra, in providing the jury with a limiting instruction. The trial court stated to the jury:
 You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence. To weigh the evidence, you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives.
 These tests include the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of the testimony; the opportunity he or she had to see, hear and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence, interest and bias, if any; together with all the facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.
 You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is totally up to you to determine what testimony is worthy of belief and what testimony is not worthy of belief.
(Tr. 495.) The trial court went on to address the instructions regarding the polygraph examination:
 The results of a polygraph examination have been admitted into evidence. The results obtained from the polygraph examination are not admitted to prove or disprove any element of any crime with which the defendant is charged. Rather, the testimony is admitted to indicate at the time of the examination the defendant was or was not telling the truth. You may consider the testimony for the purposes of testing the credibility of the defendant.
(Tr. 496-497.)
It is clear from the record that the trial court did comply with all of the necessary requirements under Souel, supra, in providing limiting instructions to the jury on the admissibility of polygraph testimony. We further overrule Owens' briefly-mentioned argument that failure to object to the instructions constituted ineffective assistance of counsel.
In light of this determination we do not find that the trial court abused its discretion in admitting the testimony, Owens was not denied a fair trial based upon this testimony, and the trial court was not deficient in its instructions to the jury regarding such testimony. As such, Owens' ninth and tenth assignments of error are overruled.
XI.
 Allowing Detective Marsh to interpret incorrectly a court document. {Sic.}
In this assignment of error, Owens argues that he was denied a fair trial because Det. Marsh mentioned the presence of a restraining order against Owens, and because Det. Marsh testified that Owens stated that the allegations in the restraining order were "`put into the wives' heads by Satan."
Owens first contends that the restraining order was simply a change of custody order, filed in June of 1996, however this order was not part of the trial court's record, and thus is not part of the record before us. Again, as we stated in Owens' second assignment of error, we are unable to consider matters outside the record before us. Ishmail, supra, at paragraph one of the syllabus. Additionally, this theory was not mentioned at trial, and as such, we will not address this issue on appeal. Powers,supra.
Furthermore, Owens argues that the reference to Satan was more prejudicial than probative, and that its mere mention "inflamed" the jury and thus was prosecutorial misconduct. Upon review of the record, we find that the statements to which Det. Marsh testified were made by Owens after he was read his rights, were relevant to the issues at trial and were not objected to by trial counsel. We further find that such statements did not amount to plain error, thus the trial court did not err in permitting such statements to be put into evidence.
Owens' eleventh assignment of error is meritless.
XII.
 The trial court erred in allowing a witness to opine as to the truthfulness of the defendant.
Owens cites as error the questioning of Det. Marsh regarding his opinion of Owens' honesty. This was met with objection by Owens, and sustained by the trial court. Owens now claims error in the mention, as it was inflammatory and "outside the bounds of legitimate cross examination."
Because the trial court sustained Owens' objection before Det. Marsh answered the question, we find that Owens suffered no prejudice from the question alone. Furthermore, the trial court instructed the jury to disregard, for evidentiary purposes, statements the attorneys made and to refrain from speculating as to what the answer to a question might have been had the court allowed a response.
Owens' twelfth assignment of error is overruled.
XIII.
 The trial court erred in failing to properly charge the jury on culpable mental state. {Sic.}
Owens claims error in the trial court's charge of the required specific intent in the various counts of gross sexual imposition. In reviewing this claim, we must view the jury instructions as a whole, because "[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." State v. Price (1979),60 Ohio St.2d 136, 14 O.O.3d 379, paragraph four of the syllabus. Thus, we must look to the surrounding instructions, where the trial court did explain in great detail the definition of "purpose" and "specific intent." In connection with the charge of rape, the trial court stated "A person acts purposely when it is his specific intention to cause a certain result." (Tr. 499) The trial court continued, "Purpose is a decision of the mind to do an act with a conscious objective of engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally." Id. Although these instructions were given in regards to the rape charge, the instructions closely preceded the instructions for gross sexual imposition. In instructing the jury on gross sexual imposition, the trial court informed the jury that the sexual contact element of gross sexual imposition includes sexual touching "for the purpose of sexually arousing or gratifying either person." (Tr. 500)
In reviewing the entire jury charge, we note that the trial court instructed the jury in accordance with the dictates of R.C.2907.05(A)(4). Furthermore, Owens did not object to the jury instructions and even noted that he was "satisfied" with the instructions. Therefore, we overrule Owens' thirteenth assignment of error.
XIV.
 The trial court erred in ruling the children competent with only a cursory hearing as to competence.
Owens argues that the trial court conducted only a "cursory examination" of the children, specifically, that the trial court "failed to ascertain the child's {sic} awareness of the importance of their obligation to tell the truth in a judicial proceeding."
"The determination of competency is within the sole discretion of the trial court." State v. Lee (1983), 9 Ohio App.3d 282,283. The Ohio Supreme Court set the standard for competency guidelines of child witnesses:
 [T]he trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.
State v. Frazier (1991), 61 Ohio St.3d 247, syllabus. Additionally, in State v. House (Dec. 17, 1993), Montgomery App. No. 13642, unreported, we found the competency determination to be "cursory" and stated the procedures to which a trial court must adhere in conducting competency hearings:
 We agree with House's characterization of the trial court's competency examination as "cursory." Specifically, there was missing any inquiry concerning the child's awareness of the importance of her obligation to tell the truth in a judicial proceeding. See, for example, State v. Lee (1983), 9 Ohio App.3d 282, 283. Although the trial court elicited from each child, in a conclusory manner, that the child understood the difference between the truth and a lie, and that the child was going to tell the truth in the courtroom, there was no inquiry concerning the child's awareness of possible adverse consequences of lying in the courtroom, whether of a spiritual or a temporal nature. In our view, this was a serious deficiency.
 Furthermore, the trial court should have done more than simply elicit an affirmative response to the question whether the child understood the difference between the truth and a lie. For example, the child could have been asked to give examples of lies told by herself or by others, so as to make sure that she has an awareness of the difference.
In this case, we find that the trial court did not conduct a "cursory" inquiry, but instead conducted a thorough examination of the children and their ability to determine the difference between the truth and a lie. The trial judge elicited examples from each child to demonstrate that they understood the difference between the truth and a lie, that they understood the consequences of what happens if they tell a lie, and that they were able to give examples of lies in contrast to truths. Both Mark, Jr. and Michael consistently testified that if they did not tell the truth they would "get in trouble." Mark, Jr. and Michael exhibited an understanding of truth and falsity and appeared to appreciate their responsibilities to be truthful.
Accordingly we find that the witnesses were competent to testify; thus the trial court did not abuse its discretion in so finding. Owens' fourteenth assignment of error is overruled.
XV.
 The trial court erred in allowing the psychologist to give opinion testimony based on his impression of the children's veracity.
Owens assigns error to two portions of Dr. Ramey's testimony. First, he argues error in Dr. Ramey's reiteration of his conversation with Kim during Lauren's first diagnostic session. In particular, he stated that Kim expressed concerns that Lauren had been engaging in "inappropriate sexual behavior, including masturbating, making comments about wanting to smell her buttocks area, and was also very clingy and exhibiting a number of emotional difficulties." However, in the next question, the prosecutor asked if Dr. Ramey evaluated those comments by Kim as being "true," to which he responded that he views such information to be "the point of view of a particular parent. I take that for being neither true or untrue, simply more information to be considered when you evaluate a child."
In this instance, trial counsel did not object to this line of questioning at trial, and because of Dr. Ramey's "disclaimer" and because of Kim's testimony to these concerns and Lauren's behavior, we cannot find this testimony to be plain error.
The second portion of Dr. Ramey's testimony which Owens claims was erroneous was his testimony that Lauren's behavior "raised a very high degree of suspicion that she had been sexually molested and that she was showing to me what had been done to her." Again, as this testimony was not met with objection at the trial level, we must now evaluate whether it amounted to plain error.
The Ohio Supreme Court has decided that "[a]n expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence."State v. Stowers (1998), 81 Ohio St.3d 260, 261. We thus do not find that Dr. Ramey's testimony amounted to plain error.
Owens' fifteenth assignment of error is overruled.
XVI.
 Appellant was deprived of his right to a fair trial by the cumulative affect of the errors occurring at trial, in contravention of the Fifth, Sixth and Fourteenth amendments of the U.S. Constitution, Article 1, Section 16 of the Ohio Constitution.
 XVIII.
 Appellant was deprived of a fair trial by the cumulative effect of the errors occurring during the trial.
In the sixteenth and eighteenth assignments of error, Owens argues that the "cumulative effect" of all errors made at trial resulted in plain error and deprived him of a fair trial. "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." State v. Fears (1999), 86 Ohio St.3d 329, 348. However, this doctrine is not applicable in instances where there is an absence of harmless and prejudicial error. State v. Garner
(1995), 74 Ohio St.3d 49, 64; State v. Blankenship (1995),102 Ohio App.3d 534, 557.
In the preceding fifteen assignments of error in this case, Owens has attempted to establish error in many facets of this trial. However, we find that Owens received a fair trial, and any errors were non-prejudicial, cumulatively as well as individually. Owens' sixteenth and eighteenth assignments of error are overruled.
XVII.
 Appellant's trial counsel was deficient and prejudiced Appellant in such a manner as to violate appellants {sic} rights as are guaranteed by the Sixth, Eight {sic} and Fourteenth Amendments of the United States {sic} Constitution.
In this final assignment of error Owens argues ineffective assistance of trial counsel based upon the plain errors and defects affecting his substantial rights as noted in his previous assignments of error. However, Owens fails to develop this argument as required by App.R. 16(A)(7), and pursuant to App.R. 12, this court may disregard "[e]rrors not specifically pointed out in the record and separately argued by brief * * *." Furthermore, as we have determined that no error had resulted from those things in which Owens had assigned error, we find that Owens' seventeenth assignment of error is without merit.
Having overruled all of Owens' eighteen assignments of error, we affirm the judgment of the trial court.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
R. Lynn Nothstine, William R. Ary, HON. JEFFREY E. FROELICH